UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Georgia M. Green,

Plaintiff,

v.

C&N Marine Corporation d/b/a MarineMax Cochrans, a Minnesota corporation, MarineMax Services, Inc., a Florida corporation, and Michael Montilino, individually,

Defendants.

Civil File No. 01-1537 (PAM/RLE)

**MEMORANDUM AND ORDER**

---

This matter is before the Court on Defendants' Motions for Summary Judgment. For the reasons that follow, the Court grants the Motions. This case arises from Plaintiff Georgia M. Green's[1] suit against Defendants C&N Marine Corporation d/b/a MarineMax Cochrans and MarineMax Services, Inc. (collectively referred to as "MarineMax") for retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363.01 et seq., and aiding and abetting discrimination under the MHRA. Green has also filed claims for aiding and abetting discrimination under the MHRA and tortious interference with

[1] After she commenced this action, Plaintiff married and changed her last name to McDowell. Nevertheless, for the purposes of this Motion, Plaintiff will be referred to as Georgia Green.

FILED SEP 04 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD SEP 04 2002
DEPUTY CLERK

contract against Defendant Michael Montilino.[2]

**BACKGROUND**

MarineMax is a retail boat seller that maintains a store in Oakdale, Minnesota. Green was employed by MarineMax as a receptionist in this store from April 2000 until her termination on March 21, 2001. Defendant Mike Montilino was the manager of the Oakdale store during Green's tenure.

In October 2000, Green's direct supervisor, Tina Weeks, went on maternity leave and Green assumed some of her responsibilities. At about the same time, Green started to e-mail Debra Groth, head of MarineMax's human relations department in Minnesota, complaining of personnel problems that neither Weeks or Montilino had resolved to her satisfaction. (See Green Dep. Exs. 5-11.) Green also approached Montilino and asked for a raise because she was performing additional duties. Although Green's salary was increased, she alleges that during the course of her conversation with Montilino about pay, Montilino made a statement to the effect that women would never earn the same level of pay at MarineMax as men. Green concedes that she cannot remember the details of the conversation and that the conversation was "global" in nature, focusing on pay differentials between men and women in the American workplace as a whole. (Id. at 37, 214-15, Ex. 18.) Additionally, Green concedes that Montilino never said that women working for MarineMax in comparable jobs

---

[2] Green has stipulated to the dismissal of her defamation and tortious interference with contract claims against MarineMax and her defamation claim against Montilino. Accordingly, the Court will not address these claims.

to men were paid less, but only that people who generated revenue for the company generally received higher compensation. (Id. at 37, 125-26.) Finally, she admits that she felt reasonably and fairly compensated for her work. (Id. at 42, Ex. 4.)

In any event, the relationship between Weeks and Green began to deteriorate after Weeks returned from maternity leave. In late January 2001, Green contacted Groth and complained about problems that she was having with Weeks related to two boat shows in Minneapolis. (See Groth Dep. at 51-52.) Groth responded by telling Green that she needed to work out these problems through her supervisor and manager. (Green Dep. Exs. 15-17.) Green now claims that the reason that she contacted Groth directly about these issues was that Montilino had made a comment, in approximately December 2000, that he was fond of Weeks. (Montilino Dep. at 44.) Accordingly, Green avers that she felt uncomfortable discussing complaints with either Weeks or Montilino.[3]

On January 29, 2001, Montilino interviewed Jim Palmer for a position at the Oakdale store. Green had formerly worked with Palmer at another employer and had charged him and three others with sexual harassment. On January 30, 2001, Green sent an e-mail to Weeks notifying her of the situation. (Green Dep. Ex. 12.) Weeks in turn shared Green's concerns

---

[3] Green contends that Montilino said that he had a "little crush" on Weeks. (Green Dep. at 222.) Although factual disputes of this nature are normally not resolved at the summary judgment stage, during the oral hearing in this matter, Green's counsel stated that it was no longer Green's position that Montilino had any sort of sexual interest in Weeks. Rather, Green merely felt uncomfortable with the comment because it evidenced a close friendship between Montilino and Weeks.

with Montilino. Ultimately, Palmer was not hired.

Nevertheless, tensions at the Oakdale store escalated, and in early February 2001, Green wrote a letter to Groth complaining of discrimination. (Id. Ex. 13.) In the letter, Green focused primarily on scheduling and division-of-labor problems that she was having with Weeks. Additionally, Green complained that Weeks told her that it was unprofessional and no longer acceptable for her to be called by her nickname, "Scuttlebutt" and complained that at one point Weeks commented to Green that women at MarineMax do not get paid as much as men. Finally, the letter mentioned Montilino's comments about the relative pay of men and women and Montilino's comment about his fondness for Weeks.

On the same day as this letter was received by Groth, Weeks and Green got into a shouting match at the Oakdale store. Green wound up leaving the store, going home, and calling Groth to advise her of the incident. Groth allegedly told Green not to return to work until the company had investigated her complaints. (Id. at 129, 257, 260-61.) Following an investigation of Green's complaint, Groth determined that, although Montilino's and Week's comments were inappropriate, neither had violated any discrimination policy. (Id. Exs. 19, 21.) Nevertheless, both Montilino and Weeks were reprimanded. (Id. Exs. 19, 21.)

Green testified that after she returned to work on February 19, 2001, she had no problem with Montilino. Indeed, she admitted that Montilino treated her in a very professional manner and that she suffered no retaliation from him. (Id. at 133-44, 228.) Green's troubles with Weeks, however, continued. In March, Green faxed another letter to

Groth outlining these difficulties. (Id. Ex. 25.) Specifically, Green complained that: (1) Weeks required her to bring a doctor's note when Green took a day off for a medical appointment; (2) Weeks required Green to get her time card signed before faxing her hours to the payroll department; (3) Weeks opened a Federal Express business package addressed to Green (Montilino actually opened this package); (4) Weeks altered the phone program to delete Green's name from appearing on the directory for the Oakdale store; (5) Weeks moved items around on Green's desk; and (6) Weeks copied Groth on her e-mail correspondence with Green. Sometime after this letter was sent, Weeks quit her job with MarineMax.

Montilino, Groth, and MarineMax's national assistant director of human relations discussed Green's letter and continuing difficulties. It appears that all three agreed that Green should be terminated. (See Groth Dep. at 41-42; Montilino Dep. at 65.) On March 21, 2001, Montilino met with Green to advise her of the decision. Montilino documented the termination on a form that indicated that the reason for the termination was insubordination. (Green Dep. Ex. 27.) In particular, the form stated that Green was terminated for her inability to get along with her supervisor. (Id.) Shortly after Green was terminated, Montilino offered to rehire Weeks "under very specific conditions," but she declined the offer. (Montilino Dep. at 70-71.)

Green has now filed this suit claiming retaliatory discharge in violation of Title VII and the MHRA, aiding and abetting discrimination under the MHRA, and tortious interference with contract.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is only proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). Nevertheless, as the United States Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Enter. Bank, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

However, because discrimination cases often turn on inferences rather than on direct evidence, courts are more deferential to the non-moving party alleging discrimination. Webb v. Garlick Mfg. Co., 94 F.3d 484, 486 (8th Cir. 1996).

### B. Green's Claims

#### 1. Retaliation

Green's retaliation claims under Title VII and the MHRA are analyzed using the same framework. See Herrero v. St. Louis Univ. Hosp., 109 F.3d 481, 483-84 (8th Cir. 1997); Henenburg v. Principal Mut. Life Ins. Co., 118 F.3d 570, 574 (8th Cir. 1997) (applying principles of Title VII analysis to MHRA claims because of the substantial similarities between the statutes); Sigurdson v. Isanti County, 386 N.W.2d 715, 719 (Minn. 1986) (analysis for MHRA claims is equivalent to analysis for Title VII claims). Because Green has no direct evidence of retaliation, the ubiquitous burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), applies to her claims. See Buettner v. Arch Coal Sales Co., Inc., 216 F.3d 707, 713 (8th Cir. 2000). As an initial matter, Green must establish a prima facie case of retaliation or face dismissal of her claims. In other words, Green must show that: (1) she engaged in a protected activity; (2) her employer subsequently took adverse employment action against her; and (3) the adverse action was casually linked to her engagement in the protected activity. Buettner, 216 F.3d at 713; Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 968 (8th Cir. 1999); Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101-02 (Minn. 1999).

If Green establishes a prima facie case of discrimination, then pursuant to McDonnell Douglas the burden shifts to MarineMax to produce a legitimate, nondiscriminatory reason for Green's termination. If MarineMax produces such a reason, the burden shifts back to Green to show that MarineMax's articulated justification is a mere pretext for illegal retaliation. See McDonnell Douglas, 411 U.S. at 802-05; Buettner, 216 F.3d at 714.

There is no dispute that Green suffered from an adverse employment action. MarineMax persuasively argues, however, that Green has failed to show that she engaged in any protected activity. To be a "protected activity," an employee must oppose or report conduct that the employee reasonably and in good faith believes relates to an unlawful, discriminatory act or policy of the employer. Sherman v. Runyon, 235 F.3d 406, 410 (8th Cir. 2000); Buettner, 216 F.3d at 714. In other words, the employee must demonstrate that he or she had a subjective "good faith" belief that the conduct reported was discriminatory and that it was objectively reasonable to have this belief. The employee's "allegations cannot be without legal foundation . . . ." Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc., 224 F.3d 701, 706 (7th Cir. 2000). Thus, "[i]f a plaintiff opposed conduct that was not proscribed by Title VII, no matter how frequent or severe, then his [or her] sincere belief that he [or she] opposed an unlawful practice cannot be reasonable." Id.

In this case, Green argues that she engaged in protected activity when she sent her February letter to Groth, which reported the comments made by Weeks and Montilino about the disparity between men's and women's salaries. As MarineMax points out, however,

discrimination is based on disparate treatment of similarly situated persons. LaCroix v. Sears, Roebuck & Co., 240 F.3d 688, 693-94 (8th Cir. 2001). Green concedes that Montilino's comment about the differences in pay between men and women was "global" and did not concern similarly situated men and women at MarineMax. She further admits that she was personally satisfied with the amount of pay that she was receiving and knew of no particular instances where a woman was being paid less at MarineMax for her labor than a man in a similar job. Likewise, Weeks' comment about men and women at MarineMax was general. In light of these admissions, the Court finds that, as a matter of law, there was no objectively reasonable basis for Green to believe that her February letter was reporting discriminatory conduct. Accordingly, Green cannot establish a prima facie case of retaliation, and summary judgment is appropriate on her retaliation claims.

**2. Aiding and Abetting Retaliation**

The MHRA provides that "[i]t is an unfair discriminatory practice for any person . . . [i]ntentionally to aid, abet, incite, compel, or coerce a person to engage in any of the practices forbidden by this chapter." Minn. Stat. § 363.03, subd. 6. Because the Court finds that Green's retaliation claims fail as a matter of law, Green's aiding and abetting claims must also fail.

**3. Tortious Interference with Contract**

Green's final claim is that Montilino tortiously interfered with her employment at MarineMax. In Minnesota, an at-will employee may maintain a tortious interference with

contract claim against a third party who wrongfully causes the termination of the employee's job. Nordling v. Northern States Power Co., 478 N.W.2d 498, 505 (Minn. 1991). To succeed on her claim, Green must show that: (1) a contract existed; (2) Montilino knew of this contract; (3) Montilino intentionally procured the breach of the contract; (4) Montilino's actions were without justification; and (5) Green has suffered damages. See Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994). It is important to note, however, that

> [A] company officer, agent or employee is privileged to interfere with or cause a breach of another employee's employment contract with the company if that person acts in good faith, whether competently or not, believing that his actions are in furtherance of the company's business. This privilege may be lost, however, if the defendant's actions are predominantly motivated by malice and bad faith, that is, by personal ill-will, spite, hostility or a deliberate intent to harm the plaintiff employee.

Nordling, 478 N.W. 2d at 507.

In this case, it is clear that an employment relationship existed between Green and MarineMax and that Montilino knew of this relationship. It is also obvious that Montilino procured the breach of that relationship. Even if genuine issues of material fact exist as to whether Montilino acted without justification, however, Green has failed to establish that Montilino acted with bad faith or with ill-will towards her. Indeed, the undisputed record indicates that Montilino terminated Green only after he had received permission to do so from his superiors. Accordingly, from his perspective, he was acting in furtherance of the company's business.

Contrary to Green's assertion, the fact that he offered to rehire Weeks after Green was

terminated does not suffice to show bad faith. In light of Green's admission that Montilino treated her professionally following her return to work on February 19, 2001, and in the absence of any other evidence, Montilino's offer to rehire Weeks under "very specific conditions" evidences nothing more than a valid staffing decision. Summary judgment is, therefore, appropriate on Green's tortious interference with contract claim.

**CONCLUSION**

For the foregoing reasons, and upon all the files, records, and proceedings herein, the Court determines that Green has failed to establish a prima facie case of retaliation. Thus, summary judgment is appropriate on her retaliation and aiding and abetting retaliation claims. Green has also failed to establish that Montilino acted in bad faith or with ill-will towards her, and summary judgment is appropriate on Green's tortious interference with contract claim.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Count V of the Complaint is **DISMISSED** with prejudice as withdrawn;

2. Insofar as it relates to Defendants C&N Marine Corporation d/b/a MarineMax Cochrans and MarineMax Services, Inc., Count IV of the Complaint, alleging tortious interference with contract, is **DISMISSED** with prejudice as withdrawn; and

3. Defendants' Motions for Summary Judgment (Clerk Doc. Nos. 15, 23) on Plaintiff's remaining claims are **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September 3, 2002

Paul A. Magnuson
United States District Court Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion*. Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*